COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
PETER S. PEARLMAN
MATTHEW GATELY
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)
psp@njlawfirm.com
mg@ njlawfirm.com

Liaison Counsel

ROBBINS GELLER RUDMAN
& DOWD LLP
RYAN A. LLORENS
ANGEL P. LAU
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
ryanl@rgrdlaw.com
alau@rgrdlaw.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| HENRY A. AND WILMA KELLEY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>AERIE PHARMACEUTICALS, INC., et al.,<br><br>Defendants. | No. 3:15-cv-03007-AET-LHG<br><br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>AND JURY DEMAND</u> |

Lead Plaintiffs City of Pontiac General Employees' Retirement System ("Pontiac GERS") maintaining its principal place of business at 2201 Auburn Road, Suite B, Auburn Hills, Michigan 48326; City of Roseville Employees' Retirement System ("Roseville") maintaining its principal place of business at 29777 Gratiot Avenue, Roseville, Michigan 48066; and Wayne County Employees' Retirement System ("WCERS") maintaining its principal place of business at 28 West Adams, Suite 1900, Detroit, Michigan 48226 (collectively, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned attorneys, for their complaint against defendants, allege the following based upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and upon an investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things, a review of Aerie Pharmaceuticals, Inc.'s ("Aerie" or the "Company") Securities and Exchange Commission ("SEC") filings, Company releases, conference calls, public statements issued by defendants, securities analyst reports, witness interviews, media reports and industry reports. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE FRAUD

1. This is a securities class action on behalf of all persons who purchased or otherwise acquired publicly traded Aerie common stock between June 25, 2014, and

April 23, 2015, inclusive (the "Class Period"), against Aerie, its Chairman and Chief Executive Officer ("CEO"), President and Chief Operating Officer ("COO"), Chief Financial Officer ("CFO"), Chief Medical Officer ("CMO") and a Director for violating §10(b) and §20(a) of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5 promulgated thereunder.

2. Aerie is a clinical-stage pharmaceutical company focused on the discovery, development and commercialization of therapies for the treatment of patients with glaucoma and other diseases of the eye. The Company's lead drug candidate is Rhopressa™ ("Rhopressa"), a once-per-day eye drop that is designed to lower intraocular pressure ("IOP") in patients with glaucoma or ocular hypertension. According to defendants, Rhopressa was an innovative, first of its type drug that was going to change glaucoma therapy.

3. During the Class Period, Aerie initiated Phase 3 clinical trials for Rhopressa and completed the first of three trials ("Rocket 1") for the drug. Rocket 1 was designed to test the 90-day efficacy of Rhopressa. It was intended to demonstrate non-inferiority to timolol, another drug used in the treatment of glaucoma. Aerie told investors that it planned to commercialize Rhopressa by 2017 and turn it into a blockbuster $1 billion glaucoma drug.

4. Despite not faring too well in its Phase 2b clinical trials, which compared Rhopressa to the leading glaucoma drug, latanoprost, the Company still expressed

high hopes for Rhopressa. In its Phase 3 trials, Aerie compared Rhopressa to a glaucoma drug that defendants believed was less effective, timolol, and narrowed the efficacy end-points to where, according to the Company, the drug essentially could not fail its next trial, in which it simply needed to be found non-inferior to timolol. Defendants also made investors aware of a study that compared latanoprost to timolol. According to defendants, the study found that timolol was significantly less effective than latanoprost, which further supported Rhopressa's chances in the Phase 3 trials. Defendants, however, neglected to also inform investors that the patient population in the latanoprost versus timolol study was materially different than the patient population in the upcoming Phase 3 trial.

5. Because defendants were exalting Rhopressa's efficacy and proclaiming that it would eventually be a blockbuster drug, investors started pouring money into the Company and its common stock price was on the rise. During the Class Period, Deerfield Management Company purchased $125 million in convertible debt and Aerie accessed another $30 million through a shelf registration statement. Aerie's common stock went from trading at $21.03 just prior to the beginning of the Class Period to reaching a peak of $35.39 on the last day of the Class Period, a 68% increase in ten months.

6. One of the defendants, however, took the meteoric rise in Aerie's stock price as an opportunity to cash-out. Anand Mehra ("Mehra"), an Aerie board

member, sold 2.22 million shares of Aerie stock while the shares were artificially inflated for proceeds of nearly $60 million. Mehra's trades were suspiciously timely. He sold 1 million shares two weeks after the Class Period began and 425,000 shares merely nine days before the Class Period ended.

7. On April 23, 2015, Aerie announced after the close of the market that Rhopressa had failed its Rocket 1 test against timolol. It was only then that investors learned Rhopressa was not the blockbuster drug they were led to believe. Because Rhopressa was proved not to be non-inferior to timolol in Rocket 1, and to latanoprost in the Phase 2b studies, any chance of Rhopressa reaching blockbuster status were mere fantasy. Investors understood that doctors were not going to prescribe a more expensive branded Rhopressa over a cheaper generic drug that it could not outperform. As a result, the artificial inflation in Aerie's stock dissipated and the price plummeted from $35.89 to $12.87 on volume of 14.7 million in one day of trading.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

10. Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). Aerie has its clinical operations in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

11. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ stock market.

## THE PARTIES

12. On July 27, 2015, the Court appointed Lead Plaintiffs to act in that capacity. As detailed in the previously-filed certifications incorporated herein by reference (Dkt. No. 14-3), Lead Plaintiffs purchased publicly traded Aerie common stock at artificially inflated prices during the Class Period and suffered damages as a result of defendants' alleged misconduct.

13. Lead Plaintiff Pontiac GERS was established in 1946 to provide retirement allowances and death and disability benefits for employees and retirees of the city of Pontiac, Michigan. As of the end of 2013, Pontiac GERS' pension plan consisted of over 1,400 members. On October 22, 2014, Pontiac GERS purchased 7,576 shares of Aerie common stock and suffered damages as a result of the violations of the federal securities laws alleged herein.

14. Lead Plaintiff Roseville was established in 1948 to provide pension and retirement benefits to the personnel of the city of Roseville, Michigan and their families and beneficiaries. As of the end of June 2014, Roseville had over 5,070 participants. Between January 21, 2015 and April 9, 2015, Roseville purchased 6,100 shares of Aerie common stock and suffered damages as a result of the violations of the federal securities laws alleged herein.

15. Lead Plaintiff WCERS was established in 1944 to provide retirement, disability, death and survivor benefits for Wayne County, Wayne County Airport Authority and Wayne County Third Circuit Court employees. As of the end of September 2014, WCERS had over 9,000 participants. Between January 21, 2015 and February 4, 2015, WCERS purchased 12,901 shares of Aerie common stock and suffered damages as a result of the violations of the federal securities laws alleged herein.

16. Defendant Aerie is a U.S.-based pharmaceutical company. It maintains its clinical operations at 135 U.S. Highway 206, Bedminster, Somerset County, New Jersey. Throughout the Class Period, Aerie's common stock was traded under the ticker "AERI" on the NASDAQ, an efficient market.

17. Defendant Vicente Anido, Jr. ("Anido") is, and at all relevant times was, Aerie's CEO and Chairman of the Board. He was named Chairman of the Board in April 2013 and became CEO in July 2013. In his publicly filed employment

agreement, Anido pledged "to ensure the integrity of all public disclosure by the Company." He signed and certified the Company's false and misleading Annual Report on Form 10-K for the year ended December 31, 2014 ("Form 10-K"), filed February 27, 2015. In addition, his misstatements were incorporated into Aerie's Class Period press releases, conference calls and presentations.

18. Anido's total compensation for 2014 was $5.25 million – which consisted of $507,000 in base salary, $386,250 in performance-based bonuses and $4.36 million in stock options. Since becoming CEO, Anido's salary has been raised twice by the Board, with an aggregate increase of 12% to the current $530,450. In February 2015, the Board further awarded him stock options for 133,125 shares of common stock and 22,188 shares of restricted stock.

19. Defendant Thomas A. Mitro ("Mitro") is, and at all relevant times was, Aerie's President and COO. He joined Aerie in August 2013. With a background in sales and marketing, Mitro presented to investors on the market potential for Rhopressa during the Company's investor day and was an active participant in Aerie's Class Period conference calls with investors, financial analysts and the media.

20. In 2014, Mitro's total compensation amounted to $2.45 million – which consisted of $380,000 in base salary, $237,500 in performance-based bonuses and $1.83 million in stock options. Since joining the Company in 2013, Mitro's salary increased 17% to the current $391,400. In February 2015, the Board further awarded

him stock options for 71,250 shares of common stock and 11,875 shares of restricted stock.

21. Defendant Richard J. Rubino ("Rubino") is, and at all relevant times was, Aerie's CFO. He joined Aerie in October 2012. Rubino signed and certified the Company's false and misleading Form 10-K. As the financial leader for the firm, Rubino was involved in the sales of Aerie securities during the Class Period and was an active participant in Aerie's Class Period conference calls with investors, financial analysts and the media.

22. In 2014, Rubino received total compensation of $1.86 million – which consisted of $365,000 in base salary, $205,313 in performance-based bonuses and $1.29 million in stock options. Since joining Aerie, Rubino's salary increased 26% to the current $375,950. In February 2015, the Board further awarded him stock options for 54,375 shares of common stock and 9,063 shares of restricted stock.

23. Defendant Brian Levy ("Levy") was, at all relevant times, Aerie's CMO. He joined Aerie in January 2012 and departed from the Company recently in July 2015. Levy was responsible for clinical trial planning and product development for Aerie. He presented to investors on the efficacy of Rhopressa during the Company's investor day and was an active participant in Aerie's Class Period conference calls with investors, financial analysts and the media.

24. In 2014, Levy's total compensation was $2.25 million – which consisted of $365,000 in base salary, $213,000 in performance-based bonuses and $1.67 million in stock options. Since joining Aerie, Levy's salary increased 32% to $375,038 in 2015. In February 2015, the Board further awarded him stock options for 61,875 shares of common stock and of 10,313 shares of restricted stock.

25. The bases for Anido's, Mitro's, Rubino's and Levy's performance awards, as stated in the Company's incentive plan, included entering into contracts or arrangements to develop or commercialize the Company's product candidates with third-parties, initiating or completing clinical trials, and achieving milestones for the development or commercialization of the Company's products.

26. Defendant Mehra is, and at all relevant times was, a member of Aerie's Board of Directors. He joined Aerie's board in August 2010 and, serving on the compensation committee, participated in the approval of the senior executives' compensation. Mehra is a Medical Doctor, having received his degree from Columbia University's College of Physicians and Surgeons. Mehra also has a background in clinical research, as he has conducted National Institute of Health-sponsored research on the outcomes, mechanisms, and development of therapeutic agents for stroke.

27. Mehra also has a significant amount of experience with start-up pharmaceutical companies. Prior to joining Sofinnova Ventures, Mehra worked in private equity and venture capital at J.P. Morgan and consulted with McKinsey and

Company advising pharmaceutical and biotech companies on core strategic issues. Along with serving on Aerie's board, Mehra is also a board member at Vicept Therapeutics Inc., Merus BV, Aclaris Therapeutics Inc., Spark Therapeutics Inc., and Marinus Pharmaceuticals Inc. He is a former Nextwave Pharmaceuticals Inc. board member.

28. Mehra is, and at all relevant times was, a general partner at Sofinnova Ventures. Sofinnova Ventures has 24 employees, and Mehra is one of four general partners that leads the firm. Sofinnova Ventures' Sofinnova Venture Partners VII fund (the "Fund") has direct ownership of Aerie's common stock. In 2011, Mehra and Sofinnova Ventures co-led the Company's $30 million Series B financing. Mehra signed the Company's false and misleading Form 10-K during the Class Period. As described on Sofinnova Ventures' website, Mehra has led Sofinnova Ventures' investments in Aerie. Through his leadership, during the Class Period, the Fund and Mehra sold 2.225 million shares of Aerie's stock for proceeds of nearly $60 million.[1]

29. The defendants referenced above in ¶¶17-28 are referred to herein collectively as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements that caused the price of Aerie's stock to be artificially inflated during the Class Period.

[1] The sale transactions were reported in Mehra's and the Fund's Form 4 filings with the SEC.

30. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Aerie's quarterly and annual reports, shareholder letters, press releases, conference calls and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or were reckless in not knowing that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

31. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Aerie or its leading drug, Rhopressa. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of publicly traded Aerie common stock was a success, as it: (i) deceived the investing public regarding Aerie's prospects and business; (ii) artificially inflated the price of publicly traded Aerie common stock; (iii) permitted Mehra to sell 2.225 million shares of Aerie common stock at artificially inflated prices during the Class Period for proceeds of approximately $60 million; and (iv) caused Lead

Plaintiffs and other members of the Class (as defined below) to purchase publicly traded Aerie common stock at artificially inflated prices.

## INSIDER TRADING

32. During the Class Period, while investors and analysts were buying into defendants' positive statements concerning Rhopressa, Mehra took advantage of the artificial inflation in Aerie's stock price caused by defendants' materially false and misleading statements and omissions. On June 25, 2014, defendants misrepresented Rhopressa's performance compared to latanoprost in a study known as Aerie's Roclatan Phase 2b study and improperly relied on a study conducted by K. Hedman and A. Alm ("Hedman and Alm Study" or the "Study") to predict Rhopressa's efficacy in Rocket 1. In response to the June 25 statements, Aerie's stock increased from $21.03 to $26.98 in one day. Merely 14 days later, on July 9, 2014, Mehra used the opportunity to sell a million shares of Aerie common stock, which was 39% of his and the Fund's Aerie holdings, for proceeds of $24 million. Mehra's sale alone represented half of Aerie stock trading volume that day.

33. After defendants reiterated their false and misleading statements concerning Rhopressa's strengths, likely success in Rocket 1 and future blockbuster qualities at the September 10, 2014 investor day conference, on November 25, 2014, Mehra sold another 800,000 shares of Aerie stock for proceeds of $20.8 million. By that time, Aerie's stock price had increased to $27.24. The 800,000 shares

represented half of his and the Funds' Aerie holdings at that time and made up 28% of Aerie stock that was traded that day.

34. Mehra's sales at the end of the Class Period are equally suspicious. As revealed on clinicaltrials.gov, the final data for Rocket 1 was collected in March 2015. By April 13, 2015, the trial was locked and the unmasked data was available to the Company. In the market's anticipation of the release of Rocket 1 data, Aerie's stock reached an all-time high up to that point, closing at $34.97. On April 14 and 15, Mehra decided to sell over 55% of his and the Funds' Aerie stock at that time, totaling 425,000 shares for proceeds of $14.3 million. The sales represented over 33% of total Aerie stock trading volume on those two days. The average sales price of the trades was $33.64. Mehra made this sale merely nine days before the Company revealed that Rocket 1 was a failure and Aerie's stock was crushed falling from $35.39 to $12.87.




## BACKGROUND TO THE CLASS PERIOD

### The Pressure on Defendants to Finally Commercialize a Glaucoma Product

35. Aerie's business plan was to tap into the $4.5 billion glaucoma market in the United States, Europe and Japan with its late-stage glaucoma drugs that it promoted as "blockbusters." Glaucoma is a term used for eye conditions that damage the optic nerve and lead to a loss of vision. The typical cause of damage to the optic nerve is elevated IOP, which is caused by excessive fluid within the eye. A clogging of the drainage canals in the eye, also known as primary open-angle glaucoma, is the

most common form of glaucoma and accounts for 90% of glaucoma cases in the United States.[2]

36. Glaucoma is treated by reducing IOP, which is measured in millimeters of mercury ("mmHg"). The Food and Drug Administration ("FDA") recognizes sustained lowering of IOP as the primary clinical endpoint for the approval of drugs to treat patients with glaucoma and ocular hypertension. Normal eye pressure ranges from 12-22 mmHg. Eye pressure greater than 22 mmHg is considered higher than normal. When the IOP is higher than normal but the person does not show signs of glaucoma, this is referred to as ocular hypertension. Only 10% of people with IOP levels of 21-30 mmHg will actually develop glaucoma and optic nerve damage.

37. At the end of 2014, an estimated 2.7 million people suffered from glaucoma in the United States. That number is expected to grow to 4.3 million by 2030. In 2013, branded and generic glaucoma products sales exceeded $2 billion in the United States alone, and $4.5 billion in the United States, Europe and Japan combined. Aerie expects the U.S. market to grow to $5 billion and include over 41 million prescriptions by 2023. Aerie informed investors that it expected to capture 40% of the growing glaucoma prescription market, with Rhopressa alone obtaining 18% of the market. Throughout the Class Period, defendants referred to Rhopressa as

---

[2] For the purposes of this Complaint, unless otherwise stated, use of the term glaucoma will be referring to primary open-angle glaucoma.

a blockbuster glaucoma drug, meaning it would generate annual sales of at least $1 billion.

38. Aerie's first attempt at a breakthrough glaucoma drug was AR-12286. AR-12286 is known as the predecessor to Rhopressa, as it too was a Rho-kinase ("ROCK") inhibitor that focused directly on the trabecular meshwork ("TM") to relieve IOP. Aerie funded a number of AR-12286 clinical trials, including at least two Phase 2 trials. AR-12286 was abandoned after a 90-day Phase 2b trial in June 2013, as it failed to demonstrate clinical non-inferiority to timolol. While it did not disclose the data from the three-month Phase 2 clinical trial, the Company acknowledged that it abandoned AR-12286 because it exhibited a loss of efficacy over time. Thus, Rhopressa (also known as AR-13324), if approved by the FDA, would be Aerie's first ever FDA-approved, marketable product.

39. On May 12, 2014, Anido emphatically hammered home the importance of Rhopressa, as he told investors, analysts and media during a conference call:

> ***[T]his is my big drug***. This is in Phase 3 trials I have committed to you and to my investors and to my Board and everybody else that we raised the money to get this thing filed in the first half of 2016. And so we're constantly looking at ways of ensuring that we hit our timelines and without dramatically impacting the expenses.[3]

40. Later in the Class Period, Anido was even more optimistic about the success of Rhopressa and the Company. In a February 10, 2015 *Reuters* article

[3] Here and throughout, emphasis is added unless stated to the contrary.



1075873_1

entitled, "New Wave of Drugs Poised to Shake up Glaucoma Treatment," Anido compared Aerie's future to that of two very successful pharmaceutical companies, stating, "[w]e think we could end up being the next Allergen or Alcon." The *Reuters* article explains that analysts were sold on Anido's predictions and they began to believe that "Aerie could become a takeover target ***if late-stage clinical trial data to be released mid-year are positive***."

**Aerie's Financing to Support Its Business Model**

41. In order for Rhopressa to attain such a lofty position in the growing glaucoma prescription market, Aerie had to gain regulatory approval for and commercialize Rhopressa. The development and eventual approval of Rhopressa required Aerie to raise capital in order to fund clinical trials, which could be as expensive as $28 million per trial. As of December 31, 2014, the cost of developing a drug compound had already caused Aerie to accumulate a deficit of $143.2 million, including a $15.0 million loss in 2012, a $31.1 million loss in 2013 and a $48.1 million loss in 2014. Thus, Aerie's losses continued to rise, yet revenue was not expected until it gained regulatory approval of and commercialized Rhopressa. As a result, potential investors needed confidence that Rhopressa would not only achieve regulatory approval in the timeframe Aerie presented, but that it would also set itself apart from other less expensive generic drugs that had proven effective and were already being prescribed.

42. In October 2013, Aerie raised $68 million in its Initial Public Offering ("IPO"). On September 9, 2014, Aerie announced that it had received commitment from Deerfield Management Company to provide for $125 million financing in the form of senior secured convertible notes. By year-end 2014, Aerie reported the fair value of its cash, cash equivalents and investments as being $158.2 million. Aerie claimed this money would enable it to "complete all of our known clinical requirements for Rhopressa and Roclatan,[4] and to commercialize Rhopressa later in 2017 ***if our trials are successful***."

43. Nevertheless, on November 3, 2014, Aerie filed a $150 million Form S-3 shelf registration statement. Rubino assured investors the filing was "routine," claiming Aerie had "no immediate need to issue additional new shares." According to Rubino, Aerie already had enough money to carry Rhopressa to market.

44. In connection with the announcement that Rhopressa failed Rocket 1, Anido disclosed that the Company had already activated its Form S-3 shelf registration to secure the $30 million it needed to "withstand the incremental trial that we think we'll have to do with Rhopressa." Thus, every delay in Aerie's schedule to get regulatory approval and commercialize Rhopressa increased the amount of cash it needed to operate. At that point, Aerie had a $60 million per year burn rate, so the

[4] Roclatan is Aerie's fixed dose combination compound that consists of Rhopressa and latanoprost.

cost of an unplanned clinical trial further burdened Aerie's limited resources and disrupted its financial schedule.

**Aerie's Competition**

45. Given the rising medical costs and heavy influence of government and private health insurance companies, in order to be a viable alternative to the glaucoma therapies already in use and become a blockbuster drug, Rhopressa could not merely be non-inferior to its generic competition. The market understood this. For example, one Canaccord analyst stated that Rhopressa being, at best, as good as timolol was cause for concern about Rhopressa's commercial success. Lowering IOP at a rate no better than the generic glaucoma drugs already on the market was not going to help get Rhopressa prescribed by healthcare providers. In order to get reimbursed at levels that would turn Rhopressa into a blockbuster drug, Rhopressa needed to offer an advantage above and beyond the likes of the generic drugs latanoprost and timolol – two of the most widely-sold glaucoma drugs on the market.

46. Prior to the Class Period, an April 15, 2013 article entitled, "Challenges for Outflow Drugs in Glaucoma," explained the complexity involved in creating a successful glaucoma drug:

> Unfortunately, having some good efficacy such that it can lower IOP equal to or "non-inferiorly" to the standard of care is not good enough to get these drugs on the market and to the patient. The reality is that the cost comparison and the ability to get these drugs reimbursed is a key driver for new and novel outflow agents being developed.

> These new compounds must compete with the once-a-day, highly efficacious, well-tolerated prostaglandins (PGAs) that are now off and/or coming off patent.
>
> In order to get reimbursed at an attractive price point, compared to a generic PGA, a new IOP-lowering agent must beat these PGAs on some front. They must offer an advantage above and beyond the PGAs in order to be reimbursed above the generic PGA price.

47. Latanoprost is a hypotensive medication that belongs to the prostaglandin analogue ("PGA") drug class. PGAs reduce IOP by increasing the flow of aqueous humor (eye fluid) through a secondary pathway, called the "uveoscleral pathway." This process diverts aqueous humor away from the trabecular meshwork ("TM"), which acts as the primary drain under normal conditions but becomes fibrotic and less permeable in glaucomatous patients. At the end of 2013, PGA's accounted for over half of the glaucoma prescriptions in the United States. Latanoprost, the most widely-prescribed drug to treat glaucoma, alone accounted for 31%.

48. Timolol is a beta adrenergic blocker ("beta blocker"), which is the second most widely used drug to fight glaucoma. Timolol and other beta blockers work by reducing the amount of aqueous humor the eye produces.

49. Competition from other pharmaceutical companies that were developing new glaucoma drugs was also influencing Aerie's urgency in getting Rhopressa approved and commercialized. The branded version of latanoprost, which is Pfizer's Xalatan, is the most recent novel glaucoma drug to hit the market, and it was launched in 1996. Mitro characterized the glaucoma marketplace as "the race to the trabecular

meshwork" and "because there hasn't been a new MOA [mechanism of action] brought . . . into the marketplace in 20 years, [physicians] feel like they've walked through a desert but are about ready to come out." The glaucoma drug market has been eager for a new drug and Aerie intended Rhopressa to be that drug.

50. In glaucoma patients, damage to the TM in the eye, which is responsible for close to 80% of fluid drainage, leads to insufficient drainage from the eye and increased levels of IOP. The uveoscleral pathway is responsible for the remaining 20% of fluid drainage from the eye.

51. The fluid being drained – aqueous humour – contains nutrients that are provided to certain tissues in the eye, including the TM. Thus, when certain drugs are used to treat glaucoma that either cause the eye to produce less fluid or drain the fluid only through the uveoscleral pathway, the TM does not get the needed nutrients. Aerie understood that this could have serious implications on the TM. During the Class Period, during a conference with investors, Aerie's Chief Scientific Officer Casey Kopczynski explained that treatments which reduced fluid outflow through the trabecular pathway deprived the trabecular tissues of antioxidant-laden nutritive fluids. This phenomenon caused increased cellular stress at the trabecular tissues and triggered a cycle of increased fibrosis, heightened IOP, and finally, a malfunctioning TM.

52. Aerie considered Rhopressa to be an important development in glaucoma treatment because, unlike currently marketed glaucoma drugs that either focus on reducing the inflow of aqueous humor into the eye (*e.g.*, timolol) or increasing uveoscleral drainage (*e.g.*, latanoprost), Rhopressa is a once-daily ROCK inhibitor. ROCK inhibitors focus on reducing IOP through increased drainage through the TM.

53. Rhopressa is not, however, the only ROCK inhibitor that is being developed. In fact, a number of Aerie's competitors are also in the middle of clinical trials and focusing on bringing a ROCK inhibitor to the market. By May 2014, a Belgian company named Amaken, a Japanese company named Kowa and well-known pharmaceutical company Novartis each had a ROCK inhibitor in either Phase 2 or Phase 3 clinical trials.

54. Recognizing the urgency to commercialize Rhopressa before Aerie's competitors received approval for their ROCK inhibitor compounds, during Aerie's 2Q 2014 earnings call, Mitro stated:

> Number one, the physicians are really excited about not necessarily a new product coming in to the glaucoma market but a new product with a new MOA. They all know that the race to the trabecular meshwork has been going on for, well, since glaucoma was first discovered and started and no one has crossed that finish line, ***they [are] very excited about our products being the first there***. So their enthusiasm around new products entering this market has to do with the new MOAs.



1075873_1

55. Further, ROCK inhibitors are not the only glaucoma therapies being developed that focus on the TM. A Cantor Fitzgerald analyst noted the following in a January 7, 2015 analyst report:

> Private company Inotek is developing an adenosine receptor agonist, trabodenosan, which is also targeting the trabecular meshwork to lower IOP. Inotek has performed Phase II trials on this compound and has said that they are "Phase III," although we have not seen a timeline delineated at this point.
>
> Valeant's subsidiary Bausch + Lomb and French company Nicox are working on a compound that combines latanoprost with nitrous oxide (latanoprostene). Although not yet proven, this drug may also work to relax the trabecular meshwork. Valeant expects to file an NDA with the FDA in mid-2015. We expect that, if approved, this drug could compete as a better version of latanoprost, although pricing latanoprostene versus generic latanoprost could be challenging.
>
> Private Belgian company Amaken is also working on a Rho kinase inhibitor to treat Glaucoma. In September 2012, Amaken announced the start of an 80-patient Phase IIa proof-of-concept trial for their AMA0076 product. A Phase II dosing study, also involving 80 patients, was commenced in May 2014. Like Aerie's products, Amaken claims that their product works on the trabecular meshwork and also reduces hyperemia. We note however, that in their May 2014 press release, Amaken said that it expects to report top-line results in 4Q:14, which to us suggests at least a delay.

**Aerie's Rhopressa Phase 2 Trials**

56. Rhopressa entered Phase 2 clinical trials – Phase 2a and Phase 2b – in 2012. In addition, Roclatan's Phase 2b trial had a Rhopressa arm that compared Roclatan against its two components – Rhopressa and latanoprost.

57. For each of the Phase 2 trials, Aerie obtained an informed consent from each patient and used the patients' prior medical treatment information to determine the necessary washout period before taking baseline IOP measurements. To participate in the study, patients must have been diagnosed with open angle glaucoma or ocular hypertension.

58. Aerie commenced the Rhopressa Phase 2b trial in November 2012. The study lasted 28 days and included 224 patients with baseline IOPs of 22 to 36 mmHg. Clinicians recorded the efficacy and safety of Rhopressa versus latanoprost.

59. Rhopressa Phase 2b concluded in May 2013 and yielded mixed results. Overall, the most effective dose of Rhopressa reduced IOP by just 5.7 mmHg after 28 days of treatment. As a result, Rhopressa was 1.1 mmHg less effective than latanoprost and "did not meet the criterion for noninferiority." Further, Rhopressa seemingly lost efficacy throughout the trial. It reduced IOP by 6.2 mmHg on day 14, but only 5.7 mmHg on day 28.

60. Despite Phase 2b testing concluding in May 2013, Rhopressa Phase 2b results were not revealed until Aerie filed its IPO registration statement on September 17, 2013. Even then, Aerie attempted to shine a positive light on the results, touting Rhopressa's "strong IOP-lowering effect" and "favorable tolerability profile." Understanding that Rhopressa could not be a blockbuster drug if it was inferior to latanoprost, defendants decided to focus on a small subset of the patient population

with baseline IOPs from 22 to 26 mmHg and proclaim "statistical non-inferiority to latanoprost in this sub-group." Leading up to the October 2013 IPO, Aerie continued to spin the Rhopressa Phase 2b results in a positive light. Notwithstanding the fact that the clinical study found Rhopressa to be inferior to latanoprost, defendants repeatedly referred to the "successful" Phase 2b trial in which "Rhopressa did exceptionally well versus latanoprost."

61. Aerie commenced Roclatan Phase 2b on January 30, 2014 and announced the results on June 25, 2014. The study involved 298 subjects, lasted 29 days and compared Roclatan to its two components. Accordingly, this trial represented another opportunity for Aerie to measure Rhopressa against latanoprost. Rhopressa again fared poorly in comparison to latanoprost. Rhopressa proved 0.7 mmHg less effective, caused 36% more hyperemia and lost 0.5 mmHg of efficacy throughout the trial.

62. Nevertheless, Levy announced: "we were very impressed with the performance of Rhopressa in this particular trial. You can see it's almost the same as latanoprost despite the increase in the baselines that were accepted into this trial and when we saw those that gave us, of course, even more confidence in the current Phase 3 program that we're carrying out against timolol with Rhopressa."

63. Aerie attributed Rhopressa's better performance in the Roclatan trial vis-à-vis its own trial to patient profiles. Anido revealed just how deep the Company

looks into the clinical trial patient profiles and studies the results and the reasons for the results. Anido told analysts and investors that Aerie was "looking at sort of the profile of these patients in the Rhopressa arm of the Roclatan trial" and doing deep dives into the data to understand each individual patient to clarify "why we had such activity that we didn't see in the original trials."

**Aerie Bolsters Investor Confidence by Altering the Criteria for Rocket 1 and Using a Prior Comparator Study**

64. Aerie significantly modified Rhopressa's clinical trial criteria from Phase 2 to Phase 3 and told investors the changes nearly guaranteed success in the upcoming trial. First, Aerie restricted the baseline IOP range to between just above 20 mmHg and below 27 mmHg. Second, Aerie changed the comparator drug from latanoprost to, according to defendants, the less effective timolol.

65. Leading up to Phase 3, Aerie conveyed timolol to investors as an inferior drug that Rhopressa could easily match. Defendants continuously referenced the Hedman and Alm Study in support of their claim that timolol was 1 mmHg less effective than latanoprost. The Hedman and Alm Study was conducted by K. Hedman and A. Alm, who pooled data from three prior studies published in 1995 and 1996. The studies took place in Scandinavia, the United Kingdom and the United States and compared timolol to latanoprost over a six-month period. The patient population of the Hedman and Alm Study differed significantly from Rocket 1. For instance, few if any patients from the Hedman and Alm Study were previously treated with a PGA.

The patient pool was comprised of individuals completely untreated (75%), previously treated with only a beta blocker (15%) and previously treated with something other than a beta blocker (10%). Even among the latter 10%, only a small portion had used PGAs. The "methods" section of the study confirmed this fact when it described the preparatory procedures for each previous treatment but did not mention PGAs.

66. The Hedman and Alm Study also differed from Rocket 1 in other material respects, including:

| | **Hedman and Alm Study** | **Rocket 1** |
|---|---|---|
| Length of Study | Six months | Three months |
| Types of Glaucoma | Included primary open-angle glaucoma, pseudo-exfoliation or pigmentary glaucoma or ocular hypertension. | Included only open-angle glaucoma or ocular hypertension.<br><br>Excluded pseudoexfoliation or pigment dispersion component, history of angle closure, or narrow angles. |
| IOP Qualification Level | Included patients with at least 22 mmHg without treatment or with a single ocular hypotensive medication at the time of screening.<br><br>No maximum IOP cap. | Two qualification visits were required, 2 to 7 days apart. Included patients with baseline IOP of 21 mmHg to 26 mmHg at the initial qualification visit and IOP of 18 mmHg to 26 mmHg (at 10:00 a.m. and 4 p.m.) at the second qualification visit.<br><br>Excluded patients with baseline IOP of 27 mmHg or higher in both eyes. |

67. Rocket 1 was scheduled to take place in the United States in 2015. And unlike the Hedman and Alm Study, Rocket 1 involved a large proportion of previously-treated patients, including those treated with PGAs. Aerie understood this distinction throughout the Class Period because it received participants' medical histories upon enrollment for each trial.

68. Because Aerie's clinical trials involved human subjects, Aerie was required to follow regulations promulgated by the FDA that serve to protect participants of the trials and ensure the quality of the studies. Prior to the inception of Rocket 1, Aerie provided training to clinicians on the usage of the electronic data capture ("EDC") database "to ensure the authenticity, integrity, and, when appropriate, the confidentiality of the electronic records."

69. The EDC database provided a centralized system for Aerie, as sponsor of Rocket 1, to monitor the progress of the trial and the subjects participating in the study. The EDC database stored auditable information reported by the clinics to the sponsor on each trial subject, including health records, medical histories and any protocol-required information such as ocular history, laser history, surgical history, systemic history, and all medications taken by the subject. In June 2014, Aerie conducted an EDC database training in Chicago for the clinicians involved in the Rocket 1 trial. MedNet was the EDC database used in Rocket 1.

70. Prior to participating in the Rocket 1 trial, patients had to provide informed consent, as required by FDA's regulation 21 C.F.R. §50.20. The informed consent enabled clinicians to collect the patient's medical history and determine whether the Rocket 1 inclusion and exclusion criteria were met. Clinicians collected each patient's entire medical history at initial screenings and entered the data into the MedNet database which was accessible by Aerie.

71. Rocket 1's protocol required clinicians to measure each of the 411 patients' IOPs nine times total: 8:00 a.m., 10:00 a.m. and 4:00 p.m. on days 14, 42, and 90. The clinicians were required to "prepare and maintain adequate and accurate case histories that recorded all observations and other data pertinent to the investigation on each individual administered the investigational drug." Rocket 1 clinicians entered the case report forms and supporting data into the MedNet database, completed lengthy case report forms at each patient visit and entered the information from the case report forms into the MedNet database.

72. As the clinical trial sponsor, Aerie was required to monitor the progress of Rocket 1, including review and evaluation evidence relating to the safety and effectiveness of the drug as it was obtained from the investigator. Indeed, in Rocket 1, this review resulted in 31 patients who participated in the Rhopressa arm of the trial being subject to early termination due to lack of efficacy, adverse events, protocol violation, withdrawal of consent and investigator decision.

73. The FDA's guidance for clinical trials confirms that in addition to safety reasons, another purpose of the FDA's sponsor monitoring requirement is to ensure the quality and accuracy of reported trial data. As such, Aerie employees conducted clinical site monitoring every two to four weeks and reviewed patients' information captured in the MedNet database against information in the source documents, including the case report forms. As a result of the FDA's regulations and best practices, Aerie had access to and reviewed patients' medical records throughout the Rocket 1 trial.

74. Aerie knew Rocket 1 included a large proportion of previously-treated patients, each of which had undernourished TMs. Aerie also knew how many of the patients were previously treated with a PGA. This profoundly increased the threat timolol presented in Rocket 1. Indeed, timolol reduces production of aqueous humor, which decreases IOP without reliance on treating the TM. Rhopressa, on the other hand, specifically targets the TM and relies on its functionality to increase flow through the trabecular pathway.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

75. During a June 25, 2014, pre-market opening conference call, defendants discussed Roclatan's 28-day Phase 2b trial results, and also discussed Rhopressa's performance in the Roclatan trial. Because Roclatan is a combination of Rhopressa

and latanoprost, each of the three drugs was compared to the others. During the call, Anido and Mitro represented to the public the following:

> [ANIDO:] And so, in fact, in this particular study, when we take a look at Rhopressa relative to latanoprost, it actually performed a little bit better than it did in the Phase 2 trials. There wasn't that big of a difference between the results for Rhopressa in this trial and as for latanoprost. So it certainly gives us a great deal of confidence about, as we enter the Phase 3 trials for Rhopressa.
>
> ***Because remember, the comparator that we are going to be using in this Phase 3 trial is timolol, and it's pretty well-known that timolol is about 1 millimeter worse than latanoprost. And so, here, since we are getting pretty darn close, and all we have to do is show noninferiority to timolol, we think we are in pretty good shape from an efficacy point of view***.
>
> * * *
>
> [MITRO:] And certainly for IOP's below 26, then that would be ideal for Rhopressa. Because as you saw in the Phase 2 results, ***Rhopressa did exceptionally well versus latanoprost versus Xalatan in its Phase 2 trial***. So, we don't think anything needs to change there.

76. In an Aerie press release on the same day, Anido added:

> "***With these strong data, we are even more confident that our products have blockbuster potential***. We continue to expect to market our products through our own sales force in North America, and plan to commence licensing discussions for commercialization outside of North America."

77. Analysts raised their price targets on Aerie's stock as a direct result of defendants' positive statements concerning Rhopressa. Promptly after the June 25, 2014 conference call, RBC Capital Markets ("RBC") issued an analyst report stating:

> We are raising our price target to $36, which is driven higher by an increased probability of success in Phase III studies and higher market potential.
>
> * * *
>
> Read-through from the Phase IIb to other studies, including Rhopressa Phase III. Results give us confidence that the Phase III study for Rhopressa is likely to demonstrate statistical non-inferiority to timolol, the leading second-line beta blocker.
>
> However, Rhopressa could be a significant revenue generator on its own right given it works in patients with lower or normal baseline IOPs.

78. Aerie's stock increased in response to the news disclosed during the conference call. The stock closed at $21.03 on June 24, 2014, opened at $28.89 on June 25, 2014 and closed on June 25, 2014 at $26.98. Over five million shares of Aerie stock were traded on June 25, 2014 after Aerie's conference call.

79. Anido's and Mitro's statements during the June 25, 2014 conference call and Anido's statement in the press release were materially false and misleading when made. The true facts that were then known or recklessly disregarded by Anido and Mitro were that:

(a) Defendants' reliance on the Hedman and Alm Study to support their statements concerning Rhopressa's efficacy were misleading because defendants failed to also disclose to investors that the Study involved a starkly different patient population than Rocket 1 would use. Namely, few if any patients from the Hedman and Alm Study were previously treated with a PGA. Conversely, defendants knew

Rocket 1 would contain a large portion of PGA users because (i) they did not screen for untreated patients, (ii) PGAs were the most common drug at the time and (iii) they monitored the medical histories of Rocket 1 patients through the EDC database. Defendants understood that PGAs divert fluid away from the TM, depriving it of nutrients and leaving it fibrotic, stiff and impermeable. They knew Rhopressa, which reduces IOP by encouraging fluid outflow through the TM, would be less effective in patients with long-term PGA use. Timolol, on the other hand, reduces IOP by inhibiting fluid production and is much less dependent on a functional TM. Thus, timolol carried a material advantage over Rhopressa in Rocket 1, which defendants knew about but failed to disclose. Instead, they used inapposite results from the Hedman and Alm Study to convince investors Aerie was "in pretty good shape" and Rhopressa would likely achieve non-inferiority to timolol.

(b) Defendants also failed to disclose the disadvantages timolol faced against latanoprost in the Hedman and Alm Study that it would not face against Rhopressa in Rocket 1. Accordingly, defendants withheld information investors needed in order to appreciate the likelihood timolol would perform better in Rocket 1. These distinctions include:

(i) ***The Length of the Study***. The Hedman and Alm Study lasted six months, while Rocket 1 only lasted three months. This is important because in general, latanoprost continues to reduce IOPs, whereas timolol either plateaus or

loses effectiveness. Defendants inappropriately used the Hedman and Alm Study – which is twice as long as Rocket 1 – to quantify latanoprost's advantage over timolol. Defendants failed to inform investors that timolol and latanoprost would be more comparable in the three-month timeframe, which is the only pertinent duration for the purpose of predicting Rocket 1 results.

(ii) ***Types of Glaucoma***. The Hedman and Alm Study included patients with pseudoexfoliation and pigmentary glaucoma, while Rocket 1 excluded them to focus on patients with primary open angle glaucoma. Pseudoexfoliation and pigmentary glaucoma are characterized by especially blocked TMs. This condition decreases the efficacy of timolol more than latanoprost. Indeed, latanoprost works by diverting fluid away from the TM and through a secondary pathway. Timolol works by reducing fluid, but does not alter normal drainage through the TM.

(iii) ***Baseline IOP Level***. The Hedman and Alm Study accepted all patients with abnormal IOPs (over 22 mmHg), while Rocket 1 included only patients with baseline IOPs of 20-27 mmHg. Patients with higher IOPs are more likely to have damaged TMs. As described above, damaged TMs affect timolol's efficacy more than latanoprost's.

(c) Defendants' claims that Rhopressa had "blockbuster potential" and could be worth $1 billion were similarly misleading. In order to become a blockbuster drug, Rhopressa would have to capture a significant portion of the $4.5 billion

glaucoma market, which meant that Rhopressa had to prove superior – not just non-inferior – to the pre-existing, less expensive drugs. Despite claims that Rhopressa was going to be a blockbuster: (i) Rhopressa had repeatedly tested less effective than latanoprost at every baseline; (ii) defendants' forecast of superiority over timolol was based on the inapposite results of the Hedman and Alm Study, discussed above; and (iii) defendants would have to significantly reduce the numbers of patients Rhopressa would be effective on by narrowing the baseline IOP criteria for its Phase 3 trials.

(d) Defendants knew that despite its consistency, Rhopressa had never tested better than latanoprost at any baseline IOP and, in reality, it proved 1.1 mmHg worse in the broader set and 0.1 mmHg worse in the subset. Similarly, in the Roclatan Phase 2b trial, Rhopressa lowered IOP 0.7 mmHg less than latanoprost. Defendants knew Rhopressa had never outperformed latanoprost, yet told investors it performed "exceptionally well" in comparison.

80. On July 9, 2014, with Aerie's stock buoyed by the false and misleading statements concerning Rhopressa and Rocket 1, and while defendants concealed material information concerning Rhopressa's efficacy and the Hedman and Alm Study, Mehra sold 1 million shares of Aerie stock for proceeds of $24 million.

81. On August 6, 2014, Anido, Rubino and Mitro participated in a conference call for analysts, media representatives and investors during which Anido continued to extol Rhopressa's capabilities and blockbuster future:

[ANIDO:] With regards to Rhopressa, our two Phase 3 Rhopressa trials in the U.S. started earlier in July. You may have seen the announcement where we dosed our first patient early in the month and we recently announced that we had – we've been given the green light to commence our Phase 3 safety study in Canada which we do plan on starting before the end of this quarter.

To remind you, the Phase 3 trial design is set up to demonstrate noninferiority to timolol which is a beta-blocker used for the treatment of glaucoma.

* * *

Now, what I'd like to do is refer back just for a moment to the Roclatan Phase 2 trial in which Rhopressa was one of the treatment arms. This gave us a chance to take a look at another set of 28-day data for Rhopressa and importantly in this trial, Rhopressa performed quite well compared to the latanoprost on this study. In fact, we believe that Rhopressa actually did better in the Roclatan Phase 2 studies than it did in its own Phase 2 studies that were conducted and reported on roughly about a year or so ago.

In this particular trial in the Roclatan trial when you compare the Rhopressa on the latanoprost arm, what was interesting was in fact, ***we were not inferior to latanoprost which gives us an awful lot of confidence, not that we were lacking that anyway relative to our performance for Rhopressa, it certainly gives us quite a bit of additional confidence because as you know, we're going to be comparing our product, Rhopressa to timolol in the Phase 3 trials and timolol is known to be at least 1 mmHg less effective at lowering intraocular pressure than latanoprost is***.

***So you could see why there is strong expectation that Rhopressa will prove to be non-inferior to timolol in Phase 3 Rhopressa trials as well***.

* * *

Again, we're very excited about everything that we're finding about the drugs and about the progress that we're making in the company. So I'm wrapping up, ***I am also very excited about the***

> ***blockbuster potential for both[,] Rhopressa and Roclatan, which [were] designed [to serve the] majority of the glaucoma market***, and I'm certainly pleased with the execution thus far.

82. After the second quarter 2014 financial results conference call, RBC promptly issued an analyst report recommending investors to purchase Aerie stock, conveying the information provided by Aerie:

> ***We believe the setup for Phase III results is favorable with Rhopressa potentially demonstrating a numerical advantage over timolol***, when statistical non-inferiority is the goal, by mid-2015 and Roclatan demonstrating a stat sig benefit over latanoprost, the current gold standard 1st line treatment in glaucoma in 2016.

83. Anido's statements concerning Rhopressa and the upcoming Rocket 1 clinical trial and Rhopressa's blockbuster material were materially false and misleading when made. The true facts that were then known or available to and recklessly disregarded by Anido were that:

(a) Defendants' reliance on the Hedman and Alm Study to support their statements concerning Rhopressa's efficacy were misleading because they failed to also disclose to investors that the Study involved a starkly different patient population than Rocket 1. Namely, defendants conceded few if any patients from the Hedman and Alm Study were previously treated with a PGA. Conversely, defendants knew Rocket 1 would contain a large portion of PGA users because (i) they did not screen for untreated patients, (ii) PGAs were the most common drug at the time and (iii) they monitored the medical histories of Rocket 1 patients through the EDC

database. Defendants also understood that PGAs divert fluid away from the TM, depriving it of nutrients and leaving it fibrotic, stiff and impermeable. They knew Rhopressa, which reduces IOP by encouraging fluid outflow through the TM, would be less effective in patients with long-term PGA use. Timolol, on the other hand, reduces IOP by inhibiting fluid production and is much less dependent upon a functional TM. Thus, timolol carried a material advantage over Rhopressa in Rocket 1, which defendants knew about but failed to disclose. Instead, defendants misleadingly omitted this information while using inapposite results from the Hedman and Alm Study to convince investors Aerie had "quite a bit of additional confidence" and Rhopressa would likely achieve non-inferiority to timolol.

(b) Defendants also failed to disclose the disadvantages timolol faced against latanoprost in the Hedman and Alm Study that it would not face against Rhopressa in Rocket 1. Accordingly, defendants withheld information investors needed in order to appreciate the likelihood timolol would perform better in Rocket 1. These distinctions include:

(i) ***The Length of the Study***. The Hedman and Alm Study lasted six months, while Rocket 1 only lasted three months. This is important because in general, latanoprost continues to reduce IOPs, whereas timolol either plateaus or loses effectiveness. Defendants inappropriately used the Hedman and Alm Study – which is twice as long as Rocket 1 – to quantify latanoprost's advantage over timolol.

Defendants failed to inform investors that timolol and latanoprost would be more comparable in the three-month timeframe, which is the only pertinent duration for the purpose of predicting Rocket 1 results.

(ii) ***Types of Glaucoma***. The Hedman and Alm Study included patients with pseudoexfoliation and pigmentary glaucoma, while Rocket 1 excluded them to focus on patients with primary open angle glaucoma. Pseudoexfoliation and pigmentary glaucoma are characterized by especially blocked TMs. This condition decreases the efficacy of timolol more than latanoprost. Indeed, latanoprost works by diverting fluid away from the TM and through a secondary pathway. Timolol works by reducing fluid, but does not alter normal drainage through the TM.

(iii) ***Baseline IOP Level***. The Hedman and Alm Study accepted all patients with abnormal IOPs (over 22 mmHg), while Rocket 1 included only patients with baseline IOPs of 20-27 mmHg. Patients with higher IOPs are more likely to have damaged TMs. As described above, damaged TMs affect timolol's efficacy more than latanoprost's.

(c) Defendants' claims that Rhopressa had "blockbuster potential" and could be worth $1 billion were similarly misleading. In order to become a blockbuster drug, Rhopressa would have to capture a significant portion of the $4.5 billion glaucoma market, which meant that Rhopressa had to prove superior – not just non-inferior – to the pre-existing, less expensive drugs. Despite claims that Rhopressa was

going to be a blockbuster: (i) Rhopressa had repeatedly tested less effective than latanoprost at every baseline; (ii) defendants' forecast of superiority over timolol was based on the inapposite results of the Hedman and Alm Study, discussed above; and (iii) defendants would have to significantly reduce the numbers of patients Rhopressa would be effective on by narrowing the baseline IOP criteria for its Phase 3 trials.

84. Aerie's promotion of Rhopressa during the September 10, 2014 Investor Day conference for analysts, media representatives and investors included the following false and misleading statements from Anido, Mitro, Levy, and the Company's Chief Scientific Officer Casey Kopczynski concerning Rhopressa's virtues:

> [ANIDO:] Today, we're going to be – I'm unveiling a number of different programs and we're going to be talking more in depth about the things that we said that we were going to do and really ***our intent is to build the major ophthalmic pharmaceutical company. We think that on the back of the two blockbuster drugs that we have, Rhopressa and Roclatan, we should be able to do that***.
>
> *   *   *
>
> [Kopczynski:] So this says that if you have a drug that can reduce perfusion pressure but does not also reduce episcleral venous pressure, it should be very effective at high baseline IOPs but it's going to lose its effectiveness as the pressures go lower. And that's exactly what has been reported in the literature for latanoprost and timolol and actually other drug classes that are currently on the market.
>
> *   *   *
>
> ***Rhopressa is very different because it's able to reduce both perfusion pressure and episcleral venous pressure, and this allows it to***

> ***maintain a much more consistent IOP lowering both at higher IOPs but also with moderate and low IOPs*** that are seen in glaucoma patients.
>
> * * *
>
> [MITRO:] First of all, [we see] differences between the performance as you know of Rhopressa and latanoprost. They see that they have to lower pressures because of the effect on EVP is much higher for Rhopressa. ***That's why we're saying we're as good, if not better, than latanoprost***. So does that help? But it's really the lower pressures that we've really focused on.
>
> * * *
>
> [LEVY:] The next slide just shows some of the slide to what Casey has showed. This is the same study, but I want to show you just two or three things out of this. One is that you can see from the bars that are on here, one is timolol in the blue and the red is latanoprost. And you can see clearly across the whole spectrum of baseline, there's 1 mm difference between timolol and latanoprost with latanoprost being 1 mm more effective than timolol.
>
> We also note from our Phase 2b study that Rhopressa was equivalent or non-inferior to latanoprost at the baselines of 22 to 26. Also timolol is the standard comparator for all of the Phase 3 trials in the U.S. that have been carried out today and we will be using and are using timolol as our comparator in our Phase 3 program.
>
> So we've used the data from this particular trial as well as the Phase 2b data that we generated to actually design our Phase 3 program, and we believe using that has ***derisked this programs significantly and gives us a pretty high confidence level in terms of our Phase 3 program because of the data that we've used to design the trials***.

85. An RBC analyst understood the materiality of these statements, as a September 25, 2014 analyst report repeats defendants' explanation and reasoning as to why Rhopressa would be superior to timolol:

> Our view: Demonstrating non-inferiority to timolol is considered a relatively lower bar, which is why we also expect the Rhopressa Phase IIIs to be successful when they readout in 1H:15.
>
> * * *
>
> What will AERI Phase IIIs show? A prostaglandin is expected to do better than a beta blocker, *e.g.*, timolol, so better efficacy should not be a surprise. AERI's Rhopressa Phase III uses timolol as a comparator and has a very good chance of demonstrating non-inferiority and possibly better efficacy.

86. Anido's, Mitro's, and Levy's statements that they expected Rhopressa to be a blockbuster drug and test non-inferior to timolol and the stated underlying rationale for those expectations at the September 10, 2014 investor meeting were materially false and misleading. The true facts that were then known or available to and recklessly disregarded by the defendants were that:

(a) Defendants' reliance on the Hedman and Alm Study to support their statements concerning Rhopressa's efficacy were misleading because they failed to also disclose to investors that the Study involved a starkly different patient population than Rocket 1 would use. Namely, few if any patients from the Hedman and Alm Study were previously treated with a PGA. Conversely, defendants knew Rocket 1 would contain a large portion of PGA users because (i) they did not screen for untreated patients, (ii) PGAs were the most common drug at the time and (iii) they monitored the medical histories of Rocket 1 patients through the EDC database. Defendants also understood that PGAs divert fluid away from the TM, depriving it of

nutrients and leaving it fibrotic, stiff and impermeable. They knew Rhopressa, which reduces IOP by encouraging fluid outflow through the TM, would be less effective in patients with long-term PGA use. Timolol, on the other hand, reduces IOP by inhibiting fluid production and is much less dependent upon a functional TM. Thus, timolol carried a material advantage over Rhopressa in Rocket 1, which defendants knew about but failed to disclose. Instead, they used inapposite results from the Hedman and Alm Study to convince investors Aerie had "derisked" the trial and Rhopressa would likely achieve non-inferiority to timolol.

(b) Defendants also failed to disclose the disadvantages timolol faced against latanoprost in the Hedman and Alm Study that it would not face against Rhopressa in Rocket 1. Accordingly, defendants withheld information investors needed in order to appreciate the likelihood timolol would perform better in Rocket 1. These distinctions include:

(i) ***The Length of the Study***. The Hedman and Alm Study lasted six months, while Rocket 1 only lasted three months. This is important because in general, latanoprost continues to reduce IOPs, whereas timolol either plateaus or loses effectiveness. Defendants inappropriately used the Hedman and Alm Study – which is twice as long as Rocket 1 – to quantify latanoprost's advantage over timolol. Defendants failed to inform investors that timolol and latanoprost would be more

comparable in the three-month timeframe, which is the only pertinent duration for the purpose of predicting Rocket 1 results.

(ii) ***Types of Glaucoma***. The Hedman and Alm Study included patients with pseudoexfoliation and pigmentary glaucoma, while Rocket 1 excluded them to focus on patients with primary open angle glaucoma. Pseudoexfoliation and pigmentary glaucoma are characterized by especially blocked TMs. This condition decreases the efficacy of timolol more than latanoprost. Indeed, latanoprost works by diverting fluid away from the TM and through a secondary pathway. Timolol works by reducing fluid, but does not alter normal drainage through the TM.

(iii) ***Baseline IOP Level***. The Hedman and Alm Study accepted all patients with abnormal IOPs (over 22 mmHg), while Rocket 1 included only patients with baseline IOPs of 20-27 mmHg. Patients with higher IOPs are more likely to have damaged TMs. As described above, damaged TMs affect timolol's efficacy more than latanoprost's.

(c) Defendants' claims that Rhopressa had "blockbuster potential" and could be worth $1 billion were similarly misleading. In order to become a blockbuster drug, Rhopressa would have to capture a significant portion of the $4.5 billion glaucoma market, which meant that Rhopressa had to prove superior – not just non-inferior – to the pre-existing, less expensive drugs. Despite claims that Rhopressa was going to be a blockbuster: (i) Rhopressa had repeatedly tested less effective than

latanoprost at every baseline; (ii) defendants' forecast of superiority over timolol was based on the inapposite results of the Hedman and Alm Study, discussed above; and (iii) defendants would have to significantly reduce the numbers of patients Rhopressa would be effective on by narrowing the baseline IOP criteria for its Phase 3 trials.

(d) Defendants knew that despite its consistency, Rhopressa had never tested better than latanoprost at any baseline IOP and, in reality, it proved 1.1 mmHg worse in the broader set and 0.1 mmHg worse in the subset. Similarly, in the Roclatan Phase 2b trial, Rhopressa lowered IOP 0.7 mmHg less than latanoprost. Defendants knew Rhopressa had never outperformed latanoprost, yet told investors it was "as good, if not better."

87. By November 25, 2014, the price of Aerie stock had increased to $27.24 per share in response to defendants' false and misleading statements. On that day, while material information was being concealed from the market, Mehra took advantage of the artificial inflation and sold 800,000 shares of Aerie stock for proceeds of $20.8 million.

88. A little over a month after Aerie announced the completion of enrollment for Rocket 1, on January 12, 2015, Aerie issued a press release entitled "Aerie Pharmaceuticals Announces Acceleration of Expected Timeline for Reporting Efficacy Results from Phase 3 Registration Trial ('Rocket 1') of Rhopressa™ – Novel

Triple-Action Product to Lower Intraocular Pressure in Patients with Glaucoma." The release stated in part:

> "As a result of Rocket 1 enrollment having been completed well ahead of schedule and after thorough review we are accelerating the expected timeline for the reporting of efficacy results from this Rhopressa™ Phase 3 registration trial. We originally planned to release the efficacy results of both Rocket 1 and Rocket 2 in mid-2015, and now expect to report efficacy results for Rocket 1 in the middle of second-quarter 2015, with Rocket 2 still on schedule for a mid-2015 efficacy read-out," stated Vicente Anido, Jr., Ph.D., Chairman and Chief Executive Officer at Aerie. "We are delighted to be able to meet this important milestone earlier in the year."
>
> * * *
>
> In the Company's Phase 2b clinical trial, which was successfully completed in May 2013, Rhopressa™ demonstrated a strong IOP-lowering effect, with mean IOP reductions of 5.7 and 6.2 mmHg (millimeters of Mercury) on days 28 and 14, respectively. ***In addition, Rhopressa™ demonstrated a consistent mean IOP-lowering effect irrespective of the baseline IOPs of the patients entered into the trial. This differentiates Rhopressa™ from currently marketed IOP-lowering agents such as market-leading prostaglandins (PGAs) and beta blockers***, which have their highest effect at higher baseline IOPs, while losing efficacy as the baseline diminishes, as shown in published studies. This is significant given that the majority of glaucoma patients have low to moderately elevated IOPs of 26 mmHg or below at the time of diagnosis. In the Roclatan™ Phase 2b trial completed in June 2014, Rhopressa™ performed with similar results as in its Phase 2b trial completed in May 2013 and, in addition, demonstrated additive efficacy when used in combination with latanoprost, the most commonly prescribed PGA.

89. A day after Aerie's January 12, 2015 press release announcing the early release of Rocket 1 results and Rhopressa's strong performance in clinical trials, RBC issued an analyst report reflecting Aerie's strong belief in the success of Rocket 1:

> Key points: Phase III Rhopressa study in mid-2Q:15 should work and . . . AERI reported completion of enrollment in Rocket 1 in December and on Monday announced that Phase III efficacy data (3-month endpoint) could be out around May, ahead of prior guidance of mid-2015 but in line with our expectations. The 3-month efficacy readout for Rocket 2 would follow in mid-2015. Finally, 12-month safety data, including from Rocket 3, would be expected around YE:15/ 1H:16. Based on previously presented Phase II data and since the Phase III Rhopressa program is enrolling patients with baseline IOPs >20 mmHg but <27 mmHg and has non-inferiority trial design to timolol (within 1.5 mmHg at all time points and within 1 mmHg at majority), ***we believe chances for success are very high***.

90. The statements in the press release referenced in ¶88, which imply that Rhopressa compared well against latanoprost in the Phase 2b trial, were materially false and misleading when made. Rhopressa had never tested better than latanoprost at any baseline IOP. In its Phase 2 trial, it proved 1.1 mmHg worse in the broader set and 0.1 mmHg worse in the lower IOP subset. Similarly, in the Roclatan Phase 2b trial, Rhopressa lowered IOP 0.7 mmHg less than latanoprost. Defendants knew Rhopressa had never outperformed latanoprost, yet suggested to investors it was better at lower IOPs.

91. On February 27, 2015, Aerie filed with the SEC its Form 10-K for its fourth quarter and full year ended December 31, 2014. The Form 10-K was signed by Anido, Rubino, and Mehra and included the following statements concerning Rhopressa's performance compared to other glaucoma drugs which were false and misleading for the reasons set forth in ¶93:

> A study by Hedman and Alm, which reports on the pooled data from three registration trials of latanoprost versus timolol, showed the IOP-lowering effect of timolol to be 1.2 mmHg less than that of latanoprost, as reflected in the graph on the following page under the heading "Comparison of Latanoprost and Timolol from Pooled Data of Three Registration Trials." ***Our Rhopressa™ Phase 2b clinical trials similarly showed Rhopressa to have an IOP-lowering effect of 1.2 mmHg less than that of latanoprost***.
>
> * * *
>
> We believe Rhopressa™ may be prescribed by eye-care professionals as an initial therapy for patients with low to moderately elevated baseline IOPs of 26 mmHg or below at the time of diagnosis, representing approximately 80% of glaucoma patients. ***At these IOP levels, we believe the amount of IOP reduction achieved by Rhopressa™ would be equal to or exceed that of all currently marketed PGA and non-PGA products***.
>
> * * *
>
> ***We believe the ability of Rhopressa™ to maintain a consistent IOP-lowering effect on baseline IOP will place Rhopressa™ in a favorable competitive position relative to current PGA and non-PGA products because a significant majority of glaucoma patients have baseline IOPs of 26 mmHg or below at the time of diagnosis***.

92. Aerie's 2014 Annual Report also included false and misleading statements concerning Rhopressa's "blockbuster" capabilities. The Annual Report, signed by Anido, was prepared in advance of the Notice of the Annual Meeting of Stockholders and distributed on February 27, 2015:

> With positive new Phase 2b data obtained on both triple-action Rhopressa™ and quadruple-action Roclatan™ in mid-2014, we believe we are well on our way to developing ***two potential blockbuster products to lower intraocular pressure (IOP) in patients with glaucoma or ocular hypertension***.

* * *

> Because Rhopressa™ has performed very well compared to latanoprost at IOP's below 26mmHg in our prior clinical trials, and because it uniquely targets the diseased tissue, ***we believe Rhopressa™, if approved, has the potential to become the future first-line drug of choice for patients with IOP's of 26mmHg or less***. We believe Rhopressa™ could also become the add-on therapy of choice for those patients where the PGA alone is no longer providing adequate efficacy due to continued deterioration of the trabecular meshwork. ***Also, unlike the PGA's and other second-line drugs, Rhopressa™ maintains a more consistent IOP-lowering profile regardless of baseline, potentially rendering it the drug of choice for the many patients suffering from low-tension glaucoma***.

* * *

> Based on a 2014 survey of eye-care physicians in the US, ***our products have the potential to achieve a total market share in excess of 40 percent, in a market that is expected to approach $5 billion by 2023***.

93. The statements in the Form 10-K and Annual Report relying on the Hedman and Alm Study to compare Rhopressa's IPO-lowering effect to timolol's and that Rhopressa would be a "blockbuster" drug that compares favorably to other already successful glaucoma drugs were materially false and misleading for additional reasons.

(a) Defendants' reliance on the Hedman and Alm Study to support their statements concerning Rhopressa's efficacy were misleading because they failed to also disclose to investors that the Study involved a starkly different patient population than Rocket 1 would use. Namely, few if any patients from the Hedman and Alm Study were previously treated with a PGA. Conversely, defendants knew

Rocket 1 would contain a large portion of PGA users because (i) they did not screen for untreated patients, (ii) PGAs were the most common drug at the time and (iii) they monitored the medical histories of Rocket 1 patients through the EDC database. Defendants also understood that PGAs divert fluid away from the TM, depriving it of nutrients and leaving it fibrotic, stiff and impermeable. They knew Rhopressa, which reduces IOP by encouraging fluid outflow through the TM, would be less effective in patients with long-term PGA use. Timolol, on the other hand, reduces IOP by inhibiting fluid production and is much less dependent upon a functional TM. Thus, timolol carried a material advantage over Rhopressa in Rocket 1, which defendants knew about but failed to disclose. Instead, they used inapposite results from the Hedman and Alm Study to convince investors Aerie Rhopressa was better than timolol and would likely achieve non-inferiority in Rocket 1.

(b) Defendants also failed to disclose the disadvantages timolol faced against latanoprost in the Hedman and Alm Study that it would not face against Rhopressa in Rocket 1. Accordingly, defendants withheld information investors needed in order to appreciate the likelihood timolol would perform better in Rocket 1. These distinctions include:

(i) ***The Length of the Study***. The Hedman and Alm Study lasted six months, while Rocket 1 only lasted three months. This is important because in general, latanoprost continues to reduce IOPs, whereas timolol either plateaus or

loses effectiveness. Defendants inappropriately used the Hedman and Alm Study – which is twice as long as Rocket 1 – to quantify latanoprost's advantage over timolol. Defendants failed to inform investors that timolol and latanoprost would be more comparable in the three-month timeframe, which is the only pertinent duration for the purpose of predicting Rocket 1 results.

(ii) ***Types of Glaucoma***. The Hedman and Alm Study included patients with pseudoexfoliation and pigmentary glaucoma, while Rocket 1 excluded them to focus on patients with primary open angle glaucoma. Pseudoexfoliation and pigmentary glaucoma are characterized by especially blocked TMs. This condition decreases the efficacy of timolol more than latanoprost. Indeed, latanoprost works by diverting fluid away from the TM and through a secondary pathway. Timolol works by reducing fluid, but does not alter normal drainage through the TM.

(iii) ***Baseline IOP Level***. The Hedman and Alm Study accepted all patients with abnormal IOPs (over 22 mmHg), while Rocket 1 included only patients with baseline IOPs of 20-27 mmHg. Patients with higher IOPs are more likely to have damaged TMs. As described above, damaged TMs affect timolol's efficacy more than latanoprost's.

(c) Defendants knew that despite its consistency, Rhopressa had never tested better than latanoprost at any baseline IOP and, in reality, it proved 1.1 mmHg worse in the broader set and 0.1 mmHg worse in the subset. Similarly, in the Roclatan

Phase 2b trial, Rhopressa lowered IOP 0.7 mmHg less than latanoprost. Defendants knew Rhopressa had never outperformed a competitor, yet told investors it could be the most preferable drug on the market.

(d) Defendants' claims that Rhopressa had "blockbuster potential" and could be worth $1 billion were similarly misleading. In order to become a blockbuster drug, Rhopressa would have to capture a significant portion of the $4.5 billion glaucoma market, which meant that Rhopressa had to prove superior – not just non-inferior – to the pre-existing, less expensive drugs. Despite claims that Rhopressa was going to be a blockbuster: (i) Rhopressa had repeatedly tested less effective than latanoprost at every baseline; (ii) defendants' forecast of superiority over timolol was based on the inapposite results of the Hedman and Alm Study, discussed above; and (iii) defendants would have to significantly reduce the numbers of patients Rhopressa would be effective on by narrowing the baseline IOP criteria for its Phase 3 trials.

94. On March 2, 2015, on a conference call to discuss the fourth quarter 2014 financial results, Anido continued to make false and misleading statements exalting the capabilities of Rhopressa:

> We are very pleased with the current status of the Rhopressa Phase 3 trials. As you will recall we have a number or registration trials. There was three of them, all comparing Rhopressa to timolol. As a reminder we have selected timolol for a number of different reasons. The entry criteria of intraocular pressure for us just about 20 and below 27 millimeters from Mercury and at that range of pressures, ***we have shown in a couple of different clinical trials they're as good as latanoprost and historically we also know that timolol has been about 1***

> ***millimeter worse than latanoprost. So we think that we're in good position here to prove what we think is necessary here in terms of non-inferiority.***
>
> * * *
>
> I think what gives us a lot of comfort is that when we looked at the Roclatan results and then compared Rhopressa to latanoprost, and that was done not by controlling pressure. We took on all comers. In that clinical trial pressures between 22 and 36. There we were able to show that we were not inferior to latanoprost, which was sort of a better result than what we got Rhopressa's own Phase 2 trials. And so we think that delta here could be anywhere from – ***we think we should be about 0.5 millimeter to 1 millimeter better than timolol at the time point, certainly to the pressures that we're studying. But yet we can be anywhere from 1 to 1.5 millimeters worse. So it gives us a pretty broad range here to – and still be okay.***

95. Anido's March 2, 2015 statements that Rhopressa would compare favorably to timolol were materially false and misleading when made. The true facts that were then known or recklessly disregarded by defendants were that:

(a) Defendants' reliance on the Hedman and Alm Study to support their statements concerning Rhopressa's efficacy was misleading because they failed to also disclose to investors that the Study involved a starkly different patient population than Rocket 1. Namely, few if any patients from the Hedman and Alm Study were previously treated with a PGA. Conversely, defendants knew Rocket 1 would contain a large portion of PGA users because (i) they did not screen for untreated patients, (ii) PGAs were the most common drug at the time and (iii) they monitored the medical histories of Rocket 1 patients through the EDC database.

Defendants also understood that PGAs divert fluid away from the TM, depriving it of nutrients and leaving it fibrotic, stiff and impermeable. They knew Rhopressa, which reduces IOP by encouraging fluid outflow through the TM, would be less effective in patients with long-term PGA use. Timolol, on the other hand, reduces IOP by inhibiting fluid production and is much less dependent upon a functional TM. Thus, timolol carried a material advantage over Rhopressa in Rocket 1, which defendants knew about but failed to disclose. Instead, they used inapposite results from the Hedman and Alm Study to convince investors Aerie was "in good position" and Rhopressa would likely achieve non-inferiority to timolol.

(b) Defendants also failed to disclose the disadvantages timolol faced against latanoprost in the Hedman and Alm Study that it would not face against Rhopressa in Rocket 1. Accordingly, defendants withheld information investors needed in order to appreciate the likelihood timolol would perform better in Rocket 1. These distinctions include:

(i) ***The Length of the Study***. The Hedman and Alm Study lasted six months, while Rocket 1 only lasted three months. This is important because in general, latanoprost continues to reduce IOPs, whereas timolol either plateaus or loses effectiveness. Defendants inappropriately used the Hedman and Alm Study – which is twice as long as Rocket 1 – to quantify latanoprost's advantage over timolol. Defendants failed to inform investors that timolol and latanoprost would be more

comparable in the three-month timeframe, which is the only pertinent duration for the purpose of predicting Rocket 1 results.

(ii) ***Types of Glaucoma***. The Hedman and Alm Study included patients with pseudoexfoliation and pigmentary glaucoma, while Rocket 1 excluded them to focus on patients with primary open angle glaucoma. Pseudoexfoliation and pigmentary glaucoma are characterized by especially blocked TMs. This condition decreases the efficacy of timolol more than latanoprost. Indeed, latanoprost works by diverting fluid away from the TM and through a secondary pathway. Timolol works by reducing fluid, but does not alter normal drainage through the TM.

(iii) ***Baseline IOP Level***. The Hedman and Alm Study accepted all patients with abnormal IOPs (over 22 mmHg), while Rocket 1 included only patients with baseline IOPs of 20-27 mmHg. Patients with higher IOPs are more likely to have damaged TMs. As described above, damaged TMs affect timolol's efficacy more than latanoprost's.

96. On March 23, 2015, Cantor Fitzgerald issued a report on Aerie based on what it had learned in a series of investor meetings with Aerie management. In reliance on what it had been told by defendants at those meetings, Cantor Fitzgerald wrote:

- **Trials on track**. The company's Rocket trials, which are evaluating the use of Rho kinase inhibitor Rhopressa in glaucoma patients with intraocular pressures (IOP) between 20 and 27 mmHg, remain on track.

* * *

- **What are the chances?** Timolol has shown in multiple trials to be about 1mmHg worse than latanoprost in lowering IOP, and the Phase 2 trials of Rhopressa and Roclatan demonstrated that Rhopressa was likely non-inferior to latanoprost in the pressure ranges under study. ***Hence, we think there is a very good chance that the data is approvable. Also, although the trial is not powered to demonstrate superiority to timolol, we think there is a good chance that we could see numerical superiority from the data***.

97. On March 24, 2015, Brean Capital, in its initiation of coverage report, echoed the Company's strong statements about the Phase 3 trials and assigned an 80% success rate to Rhopressa's Phase 3 trials (versus a typical Phase 3 success rate of 70%). The report stated in part:

> Given the strong data seen in Phase IIb, the objective nature of the primary end points, and low hurdle by using Timolol as a comparator, we believe the ongoing Phase III trials carry lower-than-average risk of failure. We assume an 80% success rate vs. a typical Phase III success rate of 70% in calculating DCF.

98. By April 13, 2015, Aerie's stock reached $34.97 per share due to the optimism about Rhopressa. On April 14, 2015, Mehra took advantage of this artificial inflation, selling 425,000 shares of Aerie stock for proceeds of $14.3 million, despite never disclosing to the market the material information concerning Rhopressa that defendants were concealing.

## INVESTORS BEGIN TO LEARN THE TRUTH

99. After the market closed on April 23, 2015, Aerie stunned investors by admitting that Rocket 1 was a failure: Rhopressa did not meet its primary efficacy endpoint of demonstrating non-inferiority to timolol. The Company tried to downplay Rhopressa's miss by indicating that Rhopressa demonstrated non-inferiority compared to timolol for patients with IOP below 26mmHg. The reality of the results, however, is that Rhopressa scored worse than timolol on seven of nine recorded measurements, including every measurement after two weeks of treatment. The Company's press release stated:

> Aerie Pharmaceuticals, Inc., a clinical-stage pharmaceutical company focused on the discovery, development and commercialization of first-in-class therapies for the treatment of patients with glaucoma and other diseases of the eye, today reported the results of its first Phase 3 registration trial (Rocket 1) for Rhopressa™, a novel once-daily, triple-action eye drop being tested for its ability to lower intraocular pressure (IOP) in patients with glaucoma or ocular hypertension. The trial did not meet its primary efficacy endpoint of demonstrating non-inferiority of IOP lowering for once-daily Rhopressa™ compared to twice-daily timolol, the most widely used comparator in registration trials for glaucoma. However, Rhopressa™ demonstrated non-inferiority compared to timolol for patients in the study with IOP below 26 millimeters of mercury (mmHg) at all nine measured time points and numerical superiority over timolol at the majority of measured time points. As discussed below, approximately 80% of glaucoma patients have IOP of 26mmHg or less at the time of diagnosis.
>
> * * *
>
> "We are obviously disappointed that we missed the primary endpoint for Rocket 1. We expected Rhopressa™ to demonstrate better performance based on the results we saw in the previous Phase 2b

> studies. However, if we had set the high end of the baseline range just one mmHg less, we would have demonstrated non-inferiority compared to timolol at all nine measured time points and numerical superiority at the majority of time points. We believe Rhopressa™ shows great promise at IOPs where the majority of patients are represented. Also, we believe the meaningful decrease in the number of patients that experienced efficacy loss at the lower baseline IOPs supports the potential benefit of the Rhopressa™ on episcleral venous pressure," said Vicente Anido, Jr., Ph.D., Chairman and Chief Executive Officer of Aerie.

100. Later on April 23, 2015, Aerie hosted a conference call in which defendants stated that the Rhopressa Rocket 1 failure was due in part to some patients with higher IOPs having had glaucoma for a long period of time. Anido acknowledged:

> [Anido:] Now we've been taking a look at why did we have 80% of the patients do extremely well and yet only – and looking at the total number of patients 20% of them had this drifting occur and we think there's a couple of different explanations as we take a look at some of the patients who are going to do so over the next month or so. We think that one likely explanation is that some of these patients with the higher IOPs could actually have had glaucoma for quite a while.
>
> ***And so if they were on for example latanoprost or any other prostaglandin where a lot of the [humor] [sic] was being shunted away from a trabecular meshwork that may have led to further fibrosis occurring at the trabecular meshwork to the point where a drug like ours that works primarily on the Rho-kinase inhibition and increasing the outflow through trabecular meshwork, if it's basically extremely fibrotic*** or drug may not work, so – and probably most like won't work, so that could be a possible explanation.
>
> * * *
>
> We can't forget the [sic] latanoprost opens up a secondary drain which further diverts acreage humor away from the trabecular meshwork

> causing even more fibrotic damage. And so we think that it's really the person's trabecular inhibitor is shot to the point where using Rho-kinase inhibitor opens it up. There's nothing to open up and so we think that explain – that would be our current best guess in terms of the – the best explanation we have.

101. Not satisfied with Anido's explanation of Rhopressa's failure, at least one analyst needed further clarification. In response, for the first time, Anido admitted that Rhopressa was inferior to timolol in its ability to reduce fluid production in the eye and on patients at the upper-end of the IOP baseline that was tested:

> [Annabel Samimy – Stifel – Analyst:] . . . But I just want to understand also something about what you said on the duration. So, you mentioned several reasons for the duration was that some of these patients may have been, had much more severe trabecular meshwork damage, maybe it was a compliance issue, maybe it was – I don't remember what the last point was but shouldn't that have that applied to all the patients? I mean shouldn't this – did you check to see these patients why would there more damage in the Rhopressa patients than in the timolol patients, shouldn't it be pretty balance in that regard?
>
> [Anido:] So they worked – so they worked differently, right. So, the Rhopressa works by the three mechanisms and so – and you could see that playing it out because they had a normal trabecular meshwork and the combination of decreasing the amount of fluid being produced with increasing the outflow to trabecular meshwork especially at the lower ends as we look at 24 and below where the episcleral venous pressure becomes really critical, we did fine. And so, it was really in that upper end of the patients and so if we can't use what we consider to be the primary mechanism at those upper ends which is the outflow via the trabecular meshwork. It does put a damper on the efficacy of our drugs. ***So whereas timolol doesn't require that you open up to meshwork and all it does is really begin shutting down the amount of fluid being produced***.

102. Obviously confused by Anido's explanation because the market understood that Rhopressa also had the ability to reduce the amount of fluid being produced, the analyst asked a follow-up question:

> ***[Annabel Samimy – Stifel – Analyst:] Is that not a mechanism that Rhopressa had as well though?***
>
> ***[Anido:] Yes, but that [is] not to the same level as timolol does.***

103. Analysts and other media members expressed their surprise at Rhopressa's failure. Analysts observed that Aerie set a low bar for itself with Rocket 1 and Rhopressa's failure, even if it somehow gets approved down the road, was a material event:

(a) a Canaccord Genuity analyst wrote in a report entitled "ROCKET1 crashes on the launch pad; downgrade to HOLD from Buy":

- ***A miss is a miss – Rhopressa wasn't non-inferior to timolol***.

* * *

- **Commercial viability**. ***Even if Rhopressa can find a path to market, we have concerns about commercial success since it now appears to only be at best, at least as good as timolol***. An NCE would certainly have a place in the glaucoma market, but we were hoping not just for non-inferiority, but for some signs of numerical superiority [sic], if not evidence of disease modification. And what was shown was at best equivalence to timolol and evidence of waning evidence over 90 days.

(b) a Cantor Fitzgerald analyst wrote in a report entitled "Rhopressa Misses Primary Endpoint: Downgrading to HOLD and Lowering PT to $12":

- **Missed at all dates**. IOP was measured at the end of week two at 8am, 10am, and 4pm, and at week six and day 90 at the same times. The trial protocol specified that the IOPs needed to be no worse than 1.5mmHg worse than timolol at all nine points. Additionally, for five of the nine points, the values have to be no worse than 1.0mmHg worse than timolol. The data missed at all times on week six and day 90, and at one time at week two.

(c) an April 23, 2015 Fierce Biotech article entitled "Aerie shares crushed after glaucoma therapy flops in PhIII" highlighted that the Company had to "mount a defense" of Rhopressa after the fatal miss:

> Two months ago Aerie Pharmaceuticals CEO Vicente Anido was boasting to Reuters that his late-stage therapy for glaucoma, Rhopressa, was on track to an approval with a clear shot at earning $1 billion a year. On Thursday evening, he was forced to mount a defense of the drug after conceding defeat in a key Phase III study and watching shares plunge more than 70% in a rout.
>
> Aerie ($AERI) set a low bar for itself, going after evidence of noninferiority of its once-daily therapy with twice-daily timolol, a beta blocker, in lowering intraocular pressure (IOP). There were signs of a drop in efficacy during the trial and a third of the patients in the Rhopressa arm suffered from red eye – a condition that was widely viewed as a potential stumbling block for the biotech.

104. The foregoing analyst comments are demonstrative of the falsity and materiality of defendants' misrepresentations and omissions.

105. In response to this news, Aerie's stock price plummeted from $35.39 to $12.87, a one-day decline of 64% on massive volume of 14.7 million shares. At that time, it was the largest volume traded in a single day of Aerie's stock. Indeed, investors now understood that Rhopressa was not the billion-dollar blockbuster

defendants claimed it would be. They were now aware of the truth – Rhopressa was inferior to both latanoprost and timolol. An EvaluatePharma article described the impact of the downfall, stating "if Rhopressa itself is a bust it is hard to see what the combination might offer over [latanoprost] alone," and "it is far from clear what [Aerie] will be able to salvage from the crash."

## LOSS CAUSATION/ECONOMIC LOSS

106. During the Class Period, defendants made false and misleading statements by misrepresenting the future prospects of Aerie's glaucoma drug Rhopressa and engaged in a scheme to deceive the market. Defendants' conduct artificially inflated the prices of Aerie's common stock and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and omissions became apparent to market participants, the price of Aerie common stock plummeted, as the prior artificial inflation came out of the prices. As a result of their purchases of Aerie common stock during the Class Period, Lead Plaintiffs and members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

107. Defendants' misleading statements and omissions, identified herein at ¶¶75, 81, 84, 88, 91, 92 and 94, had the intended effect and caused Aerie's common stock to trade at artificially inflated levels during the Class Period.

108. As a direct result of the disclosure that began after the market closed the evening of April 23, 2015, which are detailed in ¶¶99-105, Aerie's common stock

price suffered a significant decline. As set forth in the chart below, by the time the market closed on April 24, 2015, the price of Aerie stock traded on the NASDAQ plunged to $12.87 per share – a one day decline of nearly 64% on volume of 14.7 million shares, which was its highest volume ever at that point.




109. The decline in Aerie's common stock price on April 24, 2015 was a direct result of the nature and extent of defendants' prior misstatements and omissions being revealed to investors and the market. The timing and magnitude of Aerie's common stock decline negates any theory that the loss suffered by the Class was due



1075873_1

to changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to defendants' fraudulent conduct. On April 24, 2015 the NASDAQ composite was up 0.7% and the NASDAQ Biotechnology Index was down only 1%.

110. The economic loss suffered by Lead Plaintiffs and other members of the Class was a direct result of defendants' fraudulent scheme to inflate Aerie's common stock price and the subsequent decline in the value of that stock when defendants' prior misrepresentations and omissions were revealed.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

111. Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Lead Plaintiffs and other members of the Class purchased Aerie common stock between the time defendants misrepresented or failed to disclose

material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

112. At all relevant times, the market for Aerie common stock was efficient for the following reasons, among others:

(a) Aerie stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Aerie filed periodic public reports with the SEC; and

(c) Aerie regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## CLASS ACTION ALLEGATIONS

113. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Aerie common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their

legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

114. The members of the Class are so numerous that joinder of all members is impracticable. The Company's stock is actively traded on the NASDAQ and there are over 24 million shares of Aerie common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Aerie or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

115. Common questions of law and fact predominate and include: (i) whether defendants violated the 1934 Act; (ii) whether defendants omitted and/or misrepresented material facts; (iii) whether defendants knew or recklessly disregarded that their statements were false; and (iv) whether defendants' statements and/or omissions artificially inflated the price of Aerie common stock and the extent and appropriate measure of damages.

116. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

117. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

118. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

## For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

119. Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

120. Defendants are liable for making false statements and failing to disclose adverse facts known to them about Aerie. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on those who transacted in Aerie common stock during the Class Period was a success, as it: (i) deceived the investing public regarding Aerie's business; (ii) artificially inflated the price of Aerie common stock; and (iii) caused Lead Plaintiffs and other Class members to transact in Aerie common stock at inflated prices.

121. During the Class Period, defendants participated in the preparation of and/or caused to be disseminated the false or misleading statements specified in ¶¶75, 81, 84, 88, 91, 92 and 94 above, which they knew or recklessly disregarded were materially false or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

122. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their transactions in Aerie common stock during the Class Period.

123. Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Aerie's business and operations as specified herein.

124. The defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein by, among other things, participating in the making of untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about the Company and its business operations, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon those who transacted in Aerie common stock during the Class Period.

125. The defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Aerie's operating condition from the investing public and supporting the artificially inflated price of its common stock.

126. As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of Aerie's common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading

statements, or upon the integrity of the market in which the Company's common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in the defendants' public statements during the Class Period, Lead Plaintiffs and the other Class members acquired Aerie common stock during the Class Period at artificially high prices and were ultimately damaged thereby.

127. At the time of said misrepresentations and omissions, Lead Plaintiffs and other Class members were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and other Class members and the marketplace known the truth regarding the problems that Aerie was experiencing, which defendants did not disclose, Lead Plaintiffs and other Class members would not have transacted in Aerie common stock, or, if they had transacted in its common stock during the Class Period, would not have done so at the artificially inflated prices which they paid.

128. By reason of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5.

129. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and the other Class members suffered damages in connection with their Class Period transactions in Aerie common stock.

## COUNT II

### For Violation of §20(a) of the Exchange Act Against the Individual Defendants

130. Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

131. The Individual Defendants acted as controlling persons of Aerie within the meaning of §20(a) of the Exchange Act:

(a) By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading;

(b) The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

(c) Because of their positions as CEO, CFO, COO, CMO and Director, the Individual Defendants directly participated in the Company's

management and were directly involved in Aerie's operations. The Individual Defendants also controlled the contents of Aerie's public filings, press releases, conference calls, and presentations to securities analysts and the investing public. The Individual Defendants prepared, reviewed and/or were provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

132. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. Awarding Lead Plaintiffs and the members of the Class damages and interest;

C. Awarding Lead Plaintiffs' reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiffs demand a trial by jury.

DATED: September 28, 2015

COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
PETER S. PEARLMAN
MATTHEW GATELY

s/ PETER S. PEARLMAN
PETER S. PEARLMAN

Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN
& DOWD LLP
RYAN A. LLORENS
ANGEL P. LAU
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiffs

SULLIVAN, WARD, ASHER &
PATTON, P.C.
CYNTHIA J. BILLINGS
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48075-1000
Telephone: 248/746-0700
248/746-2760 (fax)

VANOVERBEKE MICHAUD &
TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Additional Counsel for Lead Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 28, 2015.

s/ PETER S. PEARLMAN

PETER S. PEARLMAN

COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)

E-mail: psp@njlawfirm.com